United States District Court
Southern District of Texas
**ENTERED**
January 20, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MELINDA RUTH HALL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:22-CV-00114 |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM AND RECOMMENDATION**

Plaintiff Melinda Ruth Hall filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to review the decision of the Commissioner of Social Security ("the Commissioner") to deny her application for Social Security disability benefits and supplemental security income. Now pending are Hall's and the Commissioner's construed cross-motions for summary judgment. (D.E. 11, 12, 14). Hall contends that the residual functional capacity ("RFC") determination made by the Administrative Law Judge ("ALJ") is not supported by substantial evidence because he failed to properly evaluate the opinion of a treating medical source. For the reasons discussed further below, it is respectfully recommended that Hall's motion (D.E. 11, 12) be **DENIED**, the Commissioner's motion (D.E. 14) be **GRANTED**, and Hall's cause of action be **DISMISSED**.

## I.     JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security and venue is appropriate because Hall resides in Bee County, Texas.  42 U.S.C. § 405(g); 28 U.S.C. § 124(b)(6).

## II.     BACKGROUND & ADMINISTRATIVE RECORD

### a. *Application and Hearing*

In March 2018, Hall filed an application for disability insurance benefits and supplemental security income, alleging a disability commencing on December 20, 2017. (*See* D.E. 8-11 at 12).  Hall claimed that her diabetes mellitus, fibromyalgia, and arthritis in her hips, back, and legs limited her ability to work.  (D.E. 8-12 at 13).  The Commissioner denied Hall's application both initially and on reconsideration.  (D.E. 8-5 at 16, 34).

In the Disability Determination Explanation at the reconsideration stage, state medical consultants Dr. Don Marler and Dr. George Carrion concluded that Hall had a severe impairment consisting of "Other and Unspecified Arthropathies," along with a non-severe depressive, bipolar, or related disorder.  (*Id.* at 22).  When evaluating Hall's RFC, Dr. Carrion concluded that she could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for 6 hours in an 8-hour work day, and sit for 6 hours in an 8-hour work day, with no other limitations.  (*Id.* at 23-24).

The ALJ held a hearing on June 18, 2019, and Hall testified to the following.  (D.E. 8-4 at 33).  The arthritis in her hips made it difficult to sit for longer than 15 minutes or stand for longer than 30 minutes.  (*Id.* at 38).  It did not only hurt in her hips, but throughout

her entire body.  (*Id.* at 39).  She could bend over and kneel or crouch, but it was difficult to stand up again.  (*Id.*).  Her neck always hurt and popped.  (*Id.* at 39-40).  The pain in her back, neck, and hips often felt connected, but she did not know if it was.  (*Id.* at 40).  She also had pain in her arms and shoulders and was only able to lift things for a few seconds.  (*Id.*).  Her grip was also affected, and she had problems with dropping things the last time she worked.  (*Id.* at 41).  She had fallen over a few times because her knees buckled.  (*Id.* at 42).  She also had pain in her heels that sometimes made it difficult to walk.  (*Id.* at 42-43).  Every few days, she had to elevate her hips for around 30 minutes.  (*Id.*).  Both her arms and legs were weak.  (*Id.* at 43-44).

Following this hearing, the ALJ issued an opinion concluding that Hall was not under a disability since December 20, 2017.  (D.E. 8-5 at 39-51).  However, the Appeals Council concluded that the ALJ failed to properly address the consistency and supportability of certain medical records, and therefore remanded for further consideration. (*Id.* at 59-60).

The ALJ held a supplemental hearing on January 8, 2021, and Hall testified to the following.  (D.E. 8-4 at 4).  For her day-to-day activities, almost all she was able to do was laundry.  (*Id.* at 9).  However, that was also difficult, and her grandsons had to help her carry the laundry.  (*Id.* at 9-10).  Her daughter did everything else.  (*Id.* at 10).  She could not return to her previous job at a grocery store because she could not stand or sit for very long.  (*Id.* at 14).  A vocational expert identified Hall's past relevant work as a cashier/checker, which was light work.  (*Id.* at 24).  The ALJ asked the vocational expert

3

whether a person with the same work experience could perform Hall's past work if she also: (1) could lift up to 10 pounds frequently and 20 pounds occasionally; and (2) was required to be able to sit or stand at-will.  (*Id.* at 25).  The vocational expert testified that such a person would not be able to complete Hall's past relevant work.  (*Id.*).  However, such a person could perform jobs such as an information clerk, assembler, and electronics worker, which were all light work.  (*Id.* at 25-26).  These jobs would still be available with an additional restriction of only adequate concentration, persistence, and pace for simple instructions and tasks.  (*Id.* at 26).  However, no jobs would be available for someone who would be off-task for 25 percent of the workday or miss 4 or more days per month.  (*Id.*).

The ALJ held a second supplemental hearing on May 19, 2021.  (D.E. 8-3 at 39). Dr. Steven Goldstein testified that Hall had the severe impairments of degenerative disc disease in the cervical and lumbar spine, diabetes, and cataracts.  (*Id.* at 44).  He noted other diagnoses in the record, but none that were medically determinable.  (*Id.*).  However, he did not think that any of the severe impairments met or equaled a listed impairment.  (*Id.* at 45).  Dr. Goldstein noted that some records indicated that Hall had an irregular gait, while others indicated that she had a normal gait, but it did not appear that she had a neuropathy that was affecting her ability to walk to the degree that she would need an assistive device.  (*Id.* at 45-46).  Dr. Goldstein found it difficult to determine what was going on because there was little evidence of physical examinations in the record.  (*Id.* at 46).  He believed that the evidence indicated that Hall still had the RFC to complete light

activities, but noted that he "could be way off because [the available evidence is] so little." (*Id.*).

On questioning from Hall's attorney, Dr. Goldstein agreed that Hall's hip arthritis was also a severe impairment, but concluded that light work was still appropriate. (*Id.* at 47-48). He explained that an x-ray shows the structure of what things look like, which does not always correlate to the level of function. (*Id.* at 48). Thus, while he suspected that the osteoarthritis evident in the x-ray would prevent Hall from doing a medium level of activities, she nonetheless had a normal gait. (*Id.*). Dr. Goldstein stated that osteoarthritis is typically a painless condition that only becomes problematic when it flares up, so the x-rays could corroborate why Hall had pain sometimes, but not all of the time. (*Id.* at 49-50). Based on the record, Dr. Goldstein did not think he could possibly reach the opinions regarding Hall's limitations that Dr. Karl Stein and nurse practitioner Lindsey Osteen provided. (*Id.* at 51).

A vocational expert testified that Hall's past relevant work was a composite job of courtesy booth cashier and cashier/checker, both of which were light work. (*Id.* at 55).

### b. Medical Records

On March 11, 2016, Hall visited the emergency room complaining of left leg pain. (D.E. 8-15 at 3). The pain had been ongoing for two days and was worsened with movement. (*Id.* at 4). She had a normal range of motion. (*Id.* at 5). She was prescribed pain medication. (*Id.* at 6).

On June 6, 2017, Hall visited Dr. Luke Rosebraugh and reported that she was having trouble walking.  (D.E. 8-16 at 30).  For three to four months, her legs felt like they were "between numb and coming out of being numb," and like there was electricity going all the way down both legs.  Both legs also swelled up, with the left leg being worse.  She also had tailbone pain.  (*Id.*).  Dr. Rosebraugh noted that she had an irregular gait.  (*Id.* at 31).  At a follow-up appointment on June 20, 2017, Hall reported that her right leg and feet still felt numb.  (*Id.* at 27).  Dr. Rosebraugh again noted that she had an irregular gait.  (*Id.*).  On July 7, 2017, Hall reported that her right leg still had an "electricity sensation" and that part of her leg hurt if she touched it a certain way.  (*Id.* at 24).  She also still had pain in her tailbone, lower back, hips, and legs.  (*Id.*).  Dr. Rosebraugh again noted that she had an irregular gait.  (*Id.* at 25).

On August 15, 2017, Hall visited Dr. Rosebraugh regarding her chronic pain.  (*Id.* at 18).  The pain was all over, but particularly in her back and neck.  (*Id.* at 20).  The pain was aching in the lower back, but sharp in the thoracic spine.  She also had tailbone pain that was worse when she sat down.  She had tingling and numbness in her legs, although it "may [have been] associated with peripheral neuropathy secondary to poorly controlled diabetes."  Her pain was moderate to severe, typically a 10/10, although the pain medication she had been using for the last month decreased it to a 7/10.  She wanted to try to reach a pain level of 2 or 3 out of 10.  Dr. Rosebraugh noted that her neck was tender and had a limited range of motion with flexion and rotation.  She also had an irregular gait. (*Id.*).  Hall received steroid injections for her arthritis.  (*Id.* at 21).  At a follow-up

appointment on August 29, 2017, Hall indicated that the pain in her joints still returned after the injections, but not at full strength.  (*Id.* at 16).  Otherwise, there was no change in her pain symptoms.  The pain medication worked for about 4 hours, but did not help with her tailbone pain.  (*Id.*).  Dr. Rosebraugh again noted that her neck was tender and had a limited range of motion with flexion and rotation.  She also had an irregular gait.  (*Id.* at 17).  She was prescribed morphine.  (*Id.*).  On the same day, she completed an x-ray of her pelvis, which showed no acute fracture or misalignment, but moderate arthritis of the bilateral hip and sacroiliac joints.  (*Id.* at 63).

At a November 2, 2017, visit to Dr. Rosebraugh, Hall reported that she had numbness and discomfort in her hands for years, and that she still had pain in her neck, back, hips, and shoulders.  (*Id.* at 11).  Her shoulders and neck popped a lot.  (*Id.* at 13).  She was also concerned that her lumbar region felt like needles at any time of the day, as did her fingers and hands.  (*Id.* at 13).  Her hip hurt badly enough that it was difficult to stand.  Dr. Rosebraugh again noted that her neck was tender and had a limited range of motion with flexion and rotation.  She had a limited range of motion and an irregular gait.  (*Id.*).

On November 8, 2017, Hall had a follow-up appointment for her chronic pain with Dr. Rosebraugh.  (*Id.* at 8).  The morphine did not help and she thought the previous medication worked better.  She still had right shoulder pain and a limited range of motion.  (*Id.*).  Dr. Rosebraugh again noted that her neck was tender and had a limited range of motion with flexion and rotation, and she had a limited range of motion generally and an

irregular gait.  (*Id.* at 8-9).  She received a steroid injection and a prescription for the previous pain medication.  (*Id.* at 9).  On the same day, she had x-rays done on her lumbar spine and right shoulder.  (*Id.* at 59-62).  The x-ray of her spine showed "mild juxta-articular sclerotic changes that are mildly more prominent on the right side," and a mild right convexity scoliotic curvature.  (*Id.* at 59).  The x-ray of her shoulder showed no "evidence to suggest specific abnormal focal finding or prominent severity degenerative changes."  (*Id.* at 61).

At a November 20, 2017, follow-up with Dr. Rosebraugh, Hall reported constant pain in her lower back.  (*Id.* at 5).  Dr. Rosebraugh noted the same range of motion limitations and irregular gait as at previous appointments, specifically with limited motion in her neck and lower back.  (*Id.* at 6).  On December 21, 2017, Hall sought a recommendation on what she could do for her scoliosis.  (*Id.* at 2).  Dr. Rosebraugh noted that her lower back was tender and that she had an irregular gait.  (*Id.* at 3).

On April 26, 2018, Hall visited Dr. Christian Okpalo and reported that it hurt to touch her skin, her lower extremities had become profoundly weak, and she could barely arise.  (D.E. 8-19 at 34).  Dr. Okpalo noted that the muscles in Hall's lower extremities were "profoundly wasted."  (*Id.* at 38).

On May 8, 2018, Hall saw the nurse practitioner at Dr. Okpalo's office and reported tingling and burning in both feet for several years.  (D.E. 8-18 at 8).  She was reported to have a normal range of motion, an even and steady gait, no unilateral weakness, a normal curvature of her spine, and no obvious joint deformities.  (*Id.*).  The same was true at

8

follow-up appointments on May 23, 2018, and July 13, 2018.  (*Id.* at 11, 13).  At the July 13 appointment, Hall's left knee was slightly tender to palpation.  (*Id.* at 13).

On September 3, 2018, Hall went to the emergency room complaining of widespread pain.  (D.E. 8-19 at 23).  She reported severe pain all over her body that was exacerbated by movement and that ibuprofen did not help.  (*Id.*).  She was reported to have muscular tenderness on her back, but a normal range of motion and gait.  (*Id.* at 25).  She was prescribed pain medication.  (*Id.* at 27).

On September 12, 2018, Hall visited Dr. Kendra Reith and reported severe hip pain that was primarily on the right side, but also went across to the left.  (D.E. 8-19 at 28).  She also reported nerve pain down the medial portion of her thigh, and she switched from sitting to standing throughout the appointment due to discomfort.  (*Id.*).  She was prescribed various medications to treat her osteoarthritis and diabetes, and also received a steroid injection in her sacroiliac joint.  (*Id.* at 29).

On February 18, 2019, Hall visited nurse practitioner Lindsey Osteen and reported constant left hip pain that was achy with sharp pain and made worse by movement.  (D.E. 8-18 at 58).  Hall had fallen twice in the last year.  However, her range of motion was intact.  (*Id.*).

On February 19, 2019, Hall had an x-ray of her left hip.  (D.E. 8-19 at 11).  The x-ray showed no arthritic change and the soft tissues were within normal limits.  There was "no acute osseous injury or osteophytic change," although there was a "subcentimeter area of sclerosis in the proximal shaft of the left femur."  The reviewing doctor concluded this

was likely a bone island, but noted that a bone scan should be considered if Hall had a history of malignancy or other high risk factors. (*Id.*).

On February 22, 2019, Hall had a CT examination of her abdomen and pelvis. (*Id.* at 9). The results were normal. (*Id.*). On April 1, 2019, Hall had tests on her cervical, thoracic, and lumbar spine, all of which were normal. (*Id.* at 6-8).

On April 12, 2019, nurse practitioner Osteen and Dr. Karl Stein completed a treating source statement regarding Hall's physical conditions. (D.E. 8-20 at 48-51). They stated that Hall would be off task more than 25% of the workday, could only maintain attention and concentration for less than 30 minutes, and would miss 4 or more days of work every month as a result of her symptoms. (*Id.* at 48). Hall could only rarely lift or carry up to 10 pounds, but never anything heavier. (*Id.* at 49). She could sit and stand for up to 4 hours each in an 8-hour workday and required the option to sit or stand at will. She also required the option to lie down or recline 3-4 times throughout the workday. (*Id.*). She did not need an assistive device to ambulate effectively, but she did require a cane at least occasionally. (*Id.* at 49-50). She could rarely reach overhead, handle, finger, feel, push, or pull. (*Id.* at 50). She could occasionally use foot controls. (*Id.*). She could never climb ladders or scaffolds or crawl, but could rarely climb stairs or ramps, balance, stoop, kneel, crouch, and rotate her head and neck. (*Id.* at 51). She could not be at unprotected heights or around moving mechanical parts, but could rarely operate a vehicle, be around humidity, wetness, dust, odors, fumes, extreme cold or heat, and vibrations. (*Id.*).

On April 24, 2019, Hall had an MRI of her cervical spine, which showed a moderate central disc protrusion at the C3-4 vertebrae, a mild central disc protrusion at the C4-5 vertebrae, a mild broad-based disc bulge at the C5-6 vertebrae, and an otherwise unremarkable MRI. (*Id.* at 56-57). An MRI of her lumbar spine showed no significant disc bulges, extrusions, or spinal canal stenosis. (*Id.* at 58).

On November 6, 2020, Dr. Joseph Larakers completed a treating source statement regarding Hall's physical conditions. (D.E. 8-21 at 55-58). Their conclusions were identical to those of Dr. Stein and nurse practitioner Osteen. (*Id.*).

### c. *ALJ Decision*

On June 29, 2021, the ALJ issued an opinion, concluding that Hall was not under a disability since December 20, 2017. (D.E. 8-3 at 14-28). At the first step of the sequential evaluation process, the ALJ concluded that Hall had not engaged in substantial gainful activity since December 20, 2017. (*Id.* at 17). At the second step, the ALJ concluded that Hall had several severe impairments that limited her ability to perform basic work activities, including (1) diabetes mellitus; (2) degenerative disc disease of the cervical and lumbar spine; (3) fibromyalgia; and (4) osteoarthritis in the back, hips, and legs. (*Id.*). At the third step, the ALJ concluded that Hall did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.* at 18).

The ALJ concluded that Hall had the residual functional capacity to perform the full range of light work and could: (1) lift or carry 10 pounds frequently and 20 pounds

occasionally; (2) stand or walk for 6 hours out of an 8-hour workday; and (3) sit for six hours out of an 8-hour workday.  (*Id.* at 19).   The ALJ concluded that Hall's medically determinable impairments could reasonably be expected to cause only some of her alleged symptoms, and that Hall's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical and other evidence. (*Id.* at 20).   The ALJ extensively summarized the medical evidence in the record.  (*Id.* at 20-25).   As to the opinion evidence, the ALJ found Dr. Goldstein's testimony persuasive and supported by the record, which showed no gait abnormalities in the relevant time period, and only musculoskeletal tenderness, but no significant abnormalities.  (*Id.* at 25). The ALJ found the limitations identified by Dr. Stein and nurse practitioner Osteen to be unsupported by their treatment records, which showed no significant musculoskeletal abnormalities, but rather only tenderness and a guarded range of motion.  (*Id.* at 26).   As to Dr. Larakers's opinion, the ALJ stated that it was unpersuasive because it was not supported by the record, which showed fairly normal physical examinations with tenderness in the lumbar spine, but no mention of gait abnormalities or abnormalities in Hall's upper extremities other than a guarded range of motion.  (*Id.* at 26-27).

At step four, the ALJ concluded that, based on her RFC, Hall was able to perform her past relevant work as a courtesy booth cashier and cashier/checker.  (*Id.* at 27).   Thus, the ALJ concluded that Hall was not under a disability since December 20, 2017.  (*Id.* at 27-28).

The Appeals Council denied Hall's request for review of the ALJ's decision. (*Id.* at 2-4).

## III. DISCUSSION

In her motion for summary judgment, Hall contends that the ALJ's RFC determination is not supported by substantial evidence because he failed to properly evaluate Dr. Larakers's opinion regarding her limitations. (D.E. 12 at 11-12). Specifically, she argues that the ALJ's reasoning for finding Dr. Larakers's opinion unpersuasive was conclusory and did not adequately analyze the consistency and supportability of the opinion. (*Id.* at 12-13). Hall asserts that the medical records consistently showed that she had an irregular gait, in contrast to the ALJ's statement that there was no evidence of gait abnormalities. (*Id.* at 13-14). Similarly, Hall contends that the medical evidence regularly showed irregularities in her upper extremities, contrary to the ALJ's conclusion that the only abnormality was a guarded range of motion. (*Id.* at 14). She argues that the ALJ's error was not harmless because, using the limitations in Dr. Larakers's opinion, she would be limited to sedentary work and, due to her age, would therefore be found disabled. (*Id.* at 15). Finally, she argues that Dr. Larakers concluded that she would be absent 4 or more times a month and off task more than 25 percent of the time, and the vocational expert testified that such limitations would prevent her from finding employment. (*Id.*).

The Commissioner responds that the ALJ's conclusion that Dr. Larakers's opinion was unpersuasive was within his discretion, particularly given the conclusory form on which the opinion was provided. (D.E. 14 at 6-7). The Commissioner argues that the

ALJ's decision reviewed the objective physical examination requirements, including acknowledging that some 2017 records referenced an irregular gait.  (*Id.* at 7 & n.1).  However, the Commissioner argues that Hall's alleged onset date was not until December 2017, there is a 12-month duration requirement, and later records showed a normal gait and otherwise normal or mild findings.  (*Id.* at 7-8 & n.1).  The Commissioner argues that the ALJ's decision shows that he considered the records from Dr. Larakers's clinic, which did not support the limitations Dr. Larakers found on the disability form.  (*Id.* at 8-9).  The Commissioner contends that the ALJ instead found the opinions of Dr. Carrion and Dr. Goldstein persuasive, and that these opinions supported the ALJ's ultimate RFC determination.  (*Id.* at 10-11).

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The burden has been described as more than a scintilla, but lower than a preponderance.  *Id.*  On review, the Court may not reweigh the evidence, and it is the ALJ's responsibility to resolve conflict in the evidence, not the Court's.  *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether: (1) the claimant is participating in substantial gainful

activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work. *Martinez*, 64 F.3d at 173-174; 20 C.F.R. §§ 404.1520(a)(4).  The claimant bears the burden of proof on the first four steps, with the burden shifting to the Commissioner at the fifth step.  *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

RFC, which is determined between the third and fourth steps, is the most a claimant can do despite their limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a); *Perez*, 415 F.3d at 461-62.  When assessing a claimant's RFC, the ALJ must consider all relevant medical and other evidence, including statements by the claimant and their family members regarding the limitations that result from their symptoms.   20 C.F.R.  §§ 404.1545(a)(3), 416.945(a)(3).  When creating the RFC, the ALJ must consider all a claimant's medically determinable impairments.  *Id.* §§ 404.1545(a)(2), 416.945(a)(2).  "[T]he determination of residual functional capacity is the sole responsibility of the ALJ."  *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012).

The ALJ does not defer or give any specific evidentiary weight to any medical opinion or prior administrative medical finding.  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  The ALJ considers several factors when evaluating medical opinions, including: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors as applicable.  *Id.* §§ 404.1520c(c), 416.920c(c).  The most important

factors when evaluating persuasiveness are supportability and consistency.  *Id.* §§ 404.1520c(a), 416.920c(a).  "Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1).  "Consistency" means that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

The ALJ must articulate how persuasive they find all of the medical opinions and prior administrative medical findings in the record.  *Id.* §§ 404.1520c(b), 416.920c(b).  The ALJ must address supportability and consistency, but the other factors are optional.  *Id.* §§ 404.1520c(b)(2); 416.920c(b)(2).  However, a "case will not be remanded simply because the ALJ did not use 'magic words.'"  *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).  Remand is only appropriate where "there is no indication the ALJ applied the correct standard."  *Id.*

Here, the ALJ adequately addressed the consistency and supportability of Dr. Larakers's opinion, and his conclusion that the limitations that Dr. Larakers identified were unpersuasive was supported by substantial evidence.  As an initial matter, the ALJ was not required to adopt Dr. Larakers's opinion wholesale, as the ALJ does not defer to any

specific medical opinion and the RFC determination is solely the ALJ's responsibility. *Taylor*, 706 F.3d at 602-03; 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the ALJ was required to consider Dr. Larakers's opinion and determine whether it was supported by Dr. Larakers's own treatment records and consistent with the evidence as whole.  20 C.F.R. §§ 404.1520c(b), 404.1545(a)(3), 416.920c(b), 416.945(a).  Similarly, the ALJ was not required to use specific "magic words" in his analysis, so long as it is clear from his opinion that he considered the consistency and supportability of the opinion.  *See Hampton*, 785 F.2d at 1311.

The ALJ specifically addressed the supportability of Dr. Larakers's opinion, noting that it was not supported by the treatment records.  (D.E. 8-3 at 26-27).  Notably, Hall's briefing also does not identify any relevant treatment records from Dr. Larakers that support the limitations he identified.  (*See* D.E. 12 at 4-7).  Instead, Hall's briefing focuses on whether Dr. Larakers's opinion was consistent with the rest of the record.  (*See id.* at 13-14).  As Hall notes, the ALJ did not specifically use the word "consistency" in his analysis, but did state that he found the opinion unpersuasive the record showed fairly normal physical examinations with tenderness in the lumbar spine, but made no mention of gait abnormalities or abnormalities in Hall's upper extremities other than a guarded range of motion.  (D.E. 8-3 at 26-27).  The ALJ's analysis was supported by substantial evidence.  Although there were several mentions of an irregular gait in the medical records, all of them were before Hall's alleged onset date of December 20, 2017.  (D.E. 8-16 at 3, 6, 9, 13, 17, 20, 25, 27, 31).  The records from throughout 2018 and 2019 indicated that

Hall had a normal gait and range of motion.  (D.E. 8-18 at 8, 11, 13, 58; D.E. 8-19 at 25).
The one exception is Dr. Okpalo's statement in April 2018 that Hall's lower extremities
were "profoundly wasted," but Dr. Okpalo's subsequent treatment notes indicated a normal
gait and range of motion.  (*See* D.E. 8-18 at 8, 11, 13; D.E. 8-19 at 38).  February 2019
tests showed that Hall's abdomen, pelvis, and spine were normal.  (D.E. 8-19 at 6-9).  A
subsequent MRI in April 2019 showed moderate and mild disc protrusions in her cervical
spine, but nothing significant in her lumbar spine.  (D.E. 8-20 at 56-58).

Accordingly, substantial evidence supported the ALJ's discussion of Dr. Larakers's
opinion, specifically his conclusion that the limitations identified in the opinion were
unpersuasive because they were not supported by Dr. Larakers's treatment records or the
consistent with the record as a whole.

## IV.   RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Hall's motion (D.E. 11,
12) be **DENIED**, the Commissioner's motion (D.E. 14) be **GRANTED**, and Hall's cause
of action be **DISMISSED**.

Respectfully submitted on January 20, 2023.

Julie K. Hampton
United States Magistrate Judge

18

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).